## GENERAL ELECTRIC CO. v. EISLER et al.

Circuit Court of Appeals, Third Circuit.
June 7, 1927.

No. 3571.

**1. Patents ☞328—1,423,956 for tipless incandescent lamp, held not infringed.**

Mitchell and White Patent, No. 1,423,956, for tipless incandescent lamp, *held* not infringed.

**2. Patents ☞328—1,423,957, for stem-making machine, held invalid for lack of invention.**

Mitchell and White patent, No. 1,423,957, for a stem-making machine, *held* invalid for lack of invention.

**3. Patents ☞39—Machine to do work before done by hand lacks "invention," where there is no substantial change in mechanics or method.**

A machine to do what was before done by hand does not disclose patentable "invention," where there is no substantial change in mechanics or method.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Invention.]

Appeal from the District Court of the United States for the District of New Jersey; Joseph L. Bodine, Judge.

Suit in equity by the General Electric Company against Charles Eisler and the Eisler Engineering Company, Inc. Decree for defendants, and complainant appeals. Affirmed.

Charles McClair, of Schenectady, N. Y., John H. Anderson, of Brooklyn, N. Y., Hubert Howson, of New York City, Frederick P. Fish, of Boston, Mass., and Howson & Howson, of New York City, for appellant.

Richard Eyre and Chas. H. Keel, both of New York City, for appellees.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, J. [1] This case concerns top tipless electric light bulbs, the air in which is exhausted through the base or neck of the bulb, while in top-tipped bulbs it is exhausted through a tube at the top, which tube, when fused, leaves a tip on the bulb head. In 1903 one Jaeger, in patent No. 729,182, showed in the accompanying cut a tipless bulb. As stated in his specification: "This is accomplished by providing an exhaust tube, which is seated or joined to the inside wall of the hollow stem, between its bottom end and the platinum wire seal. In this way connection with the vacuum chamber is made without endangering the platinum wire seal and leaving the neck portion smooth. * * * In the described manner a tipless incandescent lamp is produced, in which the exhaust tube is not near the seal of the platinum wires, and does not project from the side or bottom portion of the neck; the exhaust tube being fused to the inside wall of the stem, between the seal of the platinum wires and the bottom flange, so that it is completely within the hollow stem, but does not endanger the seal of the platinum wires." It will thus be seen that Jaeger fused the bent end of his exhaust tube to the inner wall of the stem tube, and then blew a passageway for his exhaust through the stem wall.

Subsequently, and on March 20, 1919, Mitchell and White filed an application, which by divisional applications resulted in the issue on July 25, 1922, of patent No. 1,423,956, for "tipless incandescent lamp and similar articles," and patent No. 1,423,957, for "a stem-making machine." In their specification, instead of using a bent-over tube of Jaeger's type, which is fused to the wall of the stem tube, and the exhaust passage blown directly through such stem tube wall, Mitchell and White carry their exhaust tube to a higher point straight and without bend, where the exhaust tube is fused, pressed, and closed in the solid mass there formed, or as their specification says:

"This results in a flat, solid mass of glass at the inner end of the stem tube. When this method is applied in connection with our invention, the inner end of the exhaust tube is fused at the same time as the inner end of the stem tube, and is clampd with the latter. * * * Sufficient air pressure is applied through the exhaust tube, and, preferably, additional heat is supplied to thoroughly fuse the glass around the inner end of the exhaust tube, and this causes the mass of glass to swell and become bulb-shaped. As the air pressure is continued, a passage is blown through the glass at the point of least resistance, which passage is at an angle to the flat surface of the clamp portion and usually substantially normal thereto. Inasmuch as the plane of the leading-in wires is in the direction of the flat surface, the passage is formed between them, and does not interfere with their seal. A notable result of our method is the elimination of strains in the glass adjacent to the exhaust tube union. This is due to the distribution of the glass by the blowing operation, and also the completeness of the union between the exhaust tube and the stem tube. Our method results in a very low percentage of cracked seals and is commercially reliable."

During Mitchell and White's course through the Office, the claims bearing on this feature were several times rejected by reference to Jaeger's patent. Without discussing in detail the position taken by the Office in support of such rejection on Jaeger's patent, or of the arguments made by the applicants to avoid that patent, it suffices to say the Office stood by its rejection, and, referring to certain other patents, said:

"Each show the process of fusing the juxtaposed ends of the exhaust tube and the stem, forming a mass of fused glass which inclosed a portion of the leading-in wires, compressing the mass, thereby sealing the stem. Both of these patentees, however, take care not to seal the exhaust tube, in order to obviate the necessity of subsequently blowing a hole in the mass. The Examiner submits that the applicant does not disclose any invention over either of these patents by his expedient of sealing both the stem and the exhaust tube, and then inserting the obvious and necessary step of blowing a hole in the mass. * * * If any person skilled in the art finds it necessary to seal the exhaust tube, as well as the stem during the step of sealing the two together, he will, with the teaching of Jaeger, proceed to blow a passage in the mass of glass formed in the seal."

It will thus be seen that, whether rightfully or wrongfully, these applicants found their pathway blocked by patents showing a solid mass of glass at the juxtaposed ends of the exhaust tube and stem, and that, while in them the exhaust tube was kept open, there was no

invention in blowing an exhaust tube passage through the solid surrounding glass mass, because Jaeger showed how that could be done. That juxtaposition of exhaust tube and stem in a surrounding solid mass of glass was thus antecedently disclosed was not gainsaid; but, as we understand the file wrapper, invention of Mitchell and White was based on the fact that these prior patents showed that the exhaust tube was kept open in the solid mass, and that their invention consisted in teaching the art that a passage from the exhaust tube to the bulb could be blown through the solid mass, and that Jaeger did not show it could be done, because he had no solid mass through which to blow. In that regard we note the contentions made by the applicants in order to secure their patents:

"The Examiner evidently does not understand that, when the flame plays on these glass tubes, there is a complete fusion, running together, and there is no attempt at preserving a passage through the fused mass during this fusing operation. This is distinctive of applicant's process. Attempts have been made heretofore to preserve this passage, whereas the applicants destroy the original passage or passages, and create a new passage. * * * New claims 1 to 4 have been inserted, and in these claims is expressed one of the principal distinguishing features of the applicant's invention, namely, the closing off of the tube and surrounding glass body by a solid mass of glass, and the subsequent formation of a passage through the said mass communicating with the passage in the tube. This feature is not found in the references cited. Jaeger does not stop off the tube and surrounding body. * * * Examiner will find that claims 1 to 4 call for the formation of a solid glass mass, closing off the exhaust tube and the hollow glass body surrounding it, and thereafter forming a passage extending through this mass.

"As explained in the last amendment, this distinguishes from the references cited, which either disclose the preservation of a passage through the portion which is fused, or, as in the case of Jaeger, do not close off the surrounding hollow tube. This is characteristic of the applicant's method. In this way an effective distribution can be made of the glass, so as to avoid a creation of strains, and this is one of the main reasons for the commercial success of the applicant's invention. A comparatively small percentage of cracked seals, resulting in a much lower shrinkage, is what makes the process a commercial one, as distinguished from the processes disclosed in references. * * * Certainly Jaeger does not disclose the compression of a fused mass as called for by these claims, and the other references do not disclose the formation of the fused mass with the subsequent blowing of the passage therethrough. * * * The fact that the applicant blows a passage through the the fused mass, without destroying the seal with the leading-in wires, is one of the surprising features of his invention. As explained in the specification, the aperture which is blown through the mass, and which communicates with the interior of the bulb, uniformly occurs between the leading-in wires and in a direction transverse to the plane thereof. If this had not been true, undoubtedly the applicant's invention would not have become commercial. The probable explanation is that this action is due to the greater resistance in the direction of the leading-in wires, and their reinforcing and cooling effects are probably important factors. Certainly it is startlingly new to blow a passage of this kind in such a way, when the necessity of preserving the seal and the close proximity of the leading-in wire is taken into account."

Such being the conditions surrounding the grant of the patents, we next inquire whether the defendant's tipless electric light bulb infringes. In it the leading-in wires are sealed into the solid glass fused mass at the end of the stem tube, as they are in the patented device; but the exhaust tube of defendant is not led into or sealed into such glass mass. On the contrary, the end of its exhaust tube, instead of being straight, had its end turned or angled, as was Jaeger's, and this turned end never reaches the solid sealing mass, but joins and is fused to the thin inner side wall of the stem, at which fuse point air pressure in the exhaust tube then blows an opening through the thin stem side wall. This exhaust opening, which is blown through the thin stem side wall, is blown at a point somewhere nearer the solid mass than the figures of Jaeger's patent showed; but in that defendant's bent exhaust tube does not reach the solid glass sealing mass of the patentee's device, and inasmuch as defendant's exhaust tube is purposely and necessarily bent, so as to reach the thin stem side wall, and the defendant's opening is blown through the latter, we think that in all these functional steps the defendant's bulb is a functional approach to Jaeger, and a functional departure from the patentee's.

In view of these facts, we are of opinion that to hold the defendant's structure an infringement would logically result in holding that, embodying as it does Jaeger's device, the latter anticipated Mitchell and White's patent. But, as we view it, Jaeger did not antic-

ipate and invalidate what Mitchell and White disclosed. Their invention consisted, as they themselves stated in words already quoted, in that "certainly it is startlingly new to blow a passage of this kind in such a way, when the necessity of preserving the seal and the close proximity of the leading-in wires is taken into account," and they were right in saying: "Certainly Jaeger does not disclose the compression of a fused mass as called for by these claims, and the other references do not disclose the formation of the fused mass with the subsequent blowing of the passage therethrough." Nor would the defendant's structure, if it had antedated Mitchell and White's structure, have anticipated it, because its exhaust tube is not seated in the fused mass with the leading-in wires, nor do they blow from the heart of such a fused mass an opening for the exhaust tube. So regarding, we find no error in the court below, holding the defendant did not infringe.

[2] Nor, in our judgment, was there error in its holding the machine claims invalid. In that we are in accord with the statements and reasoning of the court below when it said:

"The machine patent was applied for nearly a year after application was made for the process patent. The machine is of the general type of prior stem-making machines, such as shown in the patent of Howell and Burrows, No. 843,750, applied for in 1902. The machine of the prior art was a rotary table carrying a series of rotatable parts, with devices for receiving and holding the glass stems and lead-in wires, and for clamping the fused glass to effectually seal the wires. The table was designated to be intermittently rotated to bring the parts under the heat. The Branin machine added to the Howell and Burrows machine on internal central mandrel for holding the exhaust tube within the stem tube and keeping the tube open. The patent, at most, adds to the prior art means for directing the flow of gas into the exhaust tube to blow it out. Branin patent, No. 833,196, had a means for supplying air pressure in the space between the exhaust tube and the stem tube, to give the stem tube a finished and rounded appearance. In the Mitchell and White patent, the flow of gas to blow out the exhaust tube was automatically brought into operation. It is obvious that the addition to the machine of the prior art was merely a necessary and obvious means to perform the process of the earlier patent and not invention. All that the Mitchell and White machines add to the prior art patents are well-known mechanical means to perform the machine process. Branin had a source of air, and all that was done was to

bring that source of air into position with the exhaust tube, so that it might accomplish the purpose sought. Further, Mitchell and White did no more with their machine than Jaeger had done in his hand process, except to blow out the exhaust tube at a different point."

[3] We are here dealing with a glass-blowing machine, an art where the turntable and machine-blown glass articles were common products. Because of these facts the language used by the Supreme Court in Thropp's Sons Co. v. Seiberling, 264 U. S. 320 at page 328, 44 S. Ct. 346, 349 (68 L. Ed. 708), is even more strongly here applicable, viz.:

"The change from hand to the use of machinery often involves invention. In the making of tires, it has in fact resulted, because of the use of power, in speed of manufacture, and possibly in some greater uniformity of the product. But the record does not show that there has been substantial change in the mechanics or method of making. The steps are the same, and the succession from one to the other are as in the manual art, and the transfer from hand to power was by the usual appliances, and had all been indicated before the state patent."

The decree is affirmed.